UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

**FILED**

2002 NOV -1  P 12: 51

CLERK US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE FLORIDA

|  |  |  |
|---|---|---|
| OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC. and G. L. BREWER; GERALD E. EIDAM, JR.; CAREY R. LAUE; JAMES E. MICHAEL; ROBERT PENMAN AND JAMES E. SCHMIDT and on behalf of all others similarly situated, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | 3:02-CV-1005-J-25 HTS Case No. Complaint–Class Action |
| v. | ) ) | Demand for Jury Trial |
| LANDSTAR SYSTEM INC.; LANDSTAR EXPRESS AMERICA, INC.: LANDSTAR GEMINI, INC.; LANDSTAR INWAY, INC.; LANDSTAR LIGON, INC.; LANDSTAR LOGISTICS, INC.; and LANDSTAR RANGER, INC, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## PLAINTIFFS' CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES AND DEMAND FOR JURY TRIAL

The Owner-Operator Independent Drivers Association, Inc. ("OOIDA"), G. L. Brewer,

Gerald E. Eidam, Jr., Carey R. Laue, James E. Michael, Robert Penman and James E. Schmidt

(collectively "Plaintiffs," or for all but OOIDA, "Contracting Plaintiffs"), bring this action

seeking declaratory, injunctive and monetary relief on behalf of themselves and all others

similarly situated against Defendant Landstar System Inc., and its wholly owned operating

companies, Landstar Express America, Inc.; Landstar Gemini, Inc.; Landstar Inway, Inc.;

Landstar Ligon, Inc.; Landstar Logistics, Inc.; and Landstar Ranger, Inc. (the "operating companies") (collectively "Landstar" or "Defendant"), and allege as follows:

## NATURE OF THE ACTION

1.     The Landstar operating companies are regulated motor carriers that provide transportation of property in interstate commerce under authority issued by the U.S. Department of Transportation ("DOT").  The Landstar operating companies transport property in equipment leased from independent truckers (known as "owner-operators") including the Contracting Plaintiffs G. L. Brewer, Gerald E. Eidam, Jr., Carey R. Laue, James E. Michael, Robert Penman and James E. Schmidt and others similarly situated.   Under federal law and regulations, "authorized motor carriers" such as the Landstar operating companies may perform authorized transportation in equipment that they do not own *only* if the equipment is covered by a written lease meeting the requirements set forth in 49 C.F.R. § 376.12 (Part 376).  *See* 49 C.F.R. § 376.11(a).  Authorized motor carriers are required by regulation to follow the required lease provisions. 49 C.F.R. § 376.12.

2.     Landstar and its operating companies have engaged in a pattern and practice of conduct violating their obligations under Part 376 to Contracting Plaintiffs and others similarly situated.

## JURISDICTION AND VENUE

3.     This action arises under 49 U.S.C. §§ 14102 and 14704 *et seq.,* and 49 C.F.R. Part 376 *et seq.,* for violation of the statutes and regulations governing the terms and conditions pursuant to which truck owner-operators lease equipment to authorized motor carriers for the transport of property.

4.      Jurisdiction of this matter is granted to this court by 28 U.S.C. §§ 1331 (federal question jurisdiction), and 1337 (proceedings arising under an act of Congress regulating commerce).   The causes of action alleged here arise under the laws of the United States regulating commerce and the activities of motor carriers engaged in the transportation of property in interstate commerce, including 49 U.S.C. §§ 13501, 14102 and 14704(a)(1) and (2), and 49 C.F.R. § 376 *et seq.*  Violations of the federal regulations are privately actionable under 49 U.S.C. § 14704(a)(1) and (2).

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that Landstar maintains a place of business in this district and because a substantial part of the events giving rise to the claims raised herein occurred in this district or state.

6.      Some of the Landstar leases contain arbitration clauses that purport to require that disputes arising out of or related to the lease be arbitrated under the laws of either Florida or Illinois depending on where the operating company is located.   These arbitration clauses are unenforceable, and this action is properly before this Court.

## PARTIES TO THE ACTION

7.      Plaintiff Owner-Operator Independent Drivers Association, Inc. ("OOIDA") is a business association of persons and entities who own and operate motor vehicles, commonly known as "owner-operators."  Owner-operators are small business truckers who own and operate a truck tractor (of a tractor-trailer combination).   They lease their tractor and driving services, and often their own trailer, to motor carriers (such as Defendant), agreeing to move items in interstate commerce for the motor carrier in exchange for specified compensation.  OOIDA is a not-for-profit corporation incorporated in the State of Missouri, with its headquarters located at 1 N.W. OOIDA Drive, P.O. Box 1000, Grain Valley, Missouri  64029.  OOIDA was founded in

1973 and now has over 86,000 members residing in all fifty (50) states and in Canada. OOIDA brings this action in a representative capacity and seeks declaratory and injunctive relief on behalf of all owner-operators including those who are its members.

8.    Contracting Plaintiff G. L. Brewer, a citizen of the State of California, is an owner-operator who has leased motor vehicle equipment, with a driver, to Landstar Inway, Inc. within the meaning of 49 U.S.C. § 13907.

9.    Contracting Plaintiff Gerald E. Eidam Jr., a citizen of the State of Colorado, is an owner-operator who has leased motor vehicle equipment, with a driver, to Landstar Ligon, Inc., within the meaning of 49 U.S.C. § 13907.

10.    Contracting Plaintiff Carey R. Laue, a citizen of the State of Illinois, is an owner-operator who has leased motor vehicle equipment, with a driver, to Landstar Inway, Inc., within the meaning of 49 U.S.C. § 13907.

11.    Contracting Plaintiff James E. Michael, a citizen of the State of West Virginia, is an owner-operator who has leased motor vehicle equipment, with a driver, to Landstar Ligon, Inc., within the meaning of 49 U.S.C. § 13907.

12.    Contracting Plaintiff Robert Penman, a citizen of the State of West Virginia, is an owner-operator who has leased motor vehicle equipment, with a driver, to Landstar Ranger, Inc., within the meaning of 49 U.S.C. § 13907.

13.    Contracting Plaintiff James E. Schmidt, a citizen of the Commonwealth of Kentucky, is an owner-operator who has leased motor vehicle equipment, with a driver, to Landstar Inway, Inc., within the meaning of 49 U.S.C. § 13907.

14.    Contracting Plaintiffs G. L. Brewer , Gerald E. Eidam, Jr., Carey R. Laue, James E. Michael, Robert Penman and James E. Schmidt, are members of OOIDA.

4

15.    Contracting Plaintiffs and other similarly situated owner-operators are "owners" within the meaning of 49 C.F.R. § 376.2(d), and "lessors" within the meaning of 49 C.F.R. § 376.2(f).

16.    Each lease agreement entered between Contracting Plaintiffs and other similarly situated owner-operators, and Landstar constitutes a "lease" within the meaning of 49 C.F.R. § 376.2(e).

17.    The vehicles Contracting Plaintiffs, and other similarly situated owner-operators, provided to Landstar for use are "equipment" within the meaning of 49 C.F.R. § 376.2(b).

18.    On information and belief, the leasing agreements between Contracting Plaintiffs and Landstar Inway, Inc. Landstar Ligon, Inc. and Landstar Ranger, Inc. are substantively identical to the leasing agreements entered into between all Landstar operating companies and other similarly situated owner-operators.

19.    Landstar System, Inc. is a Delaware corporation doing business in Florida. Landstar's operating companies are regulated motor carriers, primarily engaged in the enterprise of providing transportation services to the shipping public under authority granted by DOT and formerly the ICC.  During all time material to this case, Landstar's operating companies are, and have been, an "authorized carriers" within the meaning of 49 C.F.R. § 376.2(a).

## CLASS ACTION ALLEGATIONS

20.    This action is brought by Plaintiffs as a national class action, on their own behalf and on behalf of all others similarly situated.

21.    **Class Description**.  Plaintiffs seek to represent a class (hereinafter "Class") consisting of all owner-operators in the United States who, after November 1, 1998, and through

the pendency of this proceeding, had or have leases with Landstar's operating companies that are subject to federal regulations contained in Part 376, Code of Federal Regulations.

22.   **Impracticability of Joinder**.  There are thousands of individual owner-operators who are members of this Class.  These individual owner-operators are residents of various states and travel continuously, and are, therefore widely dispersed geographically.  Thus, joinder of all potential Class Members would be impracticable.

23.   **Commonality**.  Landstar has acted toward these Class Members in a way that affects all members of the Class similarly and, accordingly, questions of fact and law are common to the Class, as are questions of the liability of Landstar, or the appropriate nature of injunctive relief.

24.   **Typicality**.  The claims of the Plaintiffs are typical of the claims of the potential Class as a whole.

25.   **Fair and Adequate Representation**.  Plaintiffs are capable of fairly and adequately protecting the interests of the Class.  Additionally, OOIDA has previously participated as class representative on behalf of owner-operators in several cases, and counsel for Plaintiffs (The Cullen Law Firm, PLLC) has been appointed Class Counsel in similar class actions throughout the country.

26.   **Class Certification Appropriate Under Rule 23(b)(2)**.  Defendant has acted and/or failed to act on grounds generally applicable to the potential class as a whole, as described further herein.  Thus, injunctive and declaratory relief is appropriate with respect to the potential class as a whole, making class certification appropriate under Fed. R. Civ. P. 23(b)(2).

27.   **Class Certification Appropriate Under Rule 23(b)(3)**.  The questions of law enumerated in the counts below are common to all potential class members, as described in

paragraph 21 *supra*, and predominate over any questions affecting only individual members which are essentially limited to the amounts due each member. Therefore, a class action is superior to other available methods for the fair and efficient adjudication of the claims herein.

28. **Additional Factors Favoring Class Certification**. Other factors favoring the certification of this suit as a class action include:

(a)  the amounts in controversy for individual owner-operators are relatively small, so that individual members of the Class would not find it cost-effective to bring individual claims;

(b)  requiring individuals to prosecute separate actions would substantially impair or impede the individual members' ability to protect their interests;

(c)  on information and belief, there is no litigation already commenced by Class Members concerning the causes of action raised in this Complaint;

(d)  it is desirable to concentrate the individual members' claims in one forum because, given the amount in controversy, to require these claims to be brought in separate forums would effectively prevent individuals from bringing claims to recover their funds;

(e)  no substantial difficulties are likely to be encountered in managing this class action; and

(f)  Plaintiffs are represented by The Cullen Law Firm, PLLC, which has the experience of representing their clients in numerous class actions involving owner-operators and other small business truckers nationwide.

7

## FEDERAL REGULATORY SETTING

29.    Under federal law, an authorized motor carrier may perform authorized transportation in equipment it does not own only under a written lease granting use of the equipment and meeting the requirements contained in 49 C.F.R. § 376.12.    49 C.F.R. § 376.11(a); *see also* 49 U.S.C. § 14102.  A person injured on account of an authorized carrier's violation of or failure to comply with the federal leasing regulations may bring an action seeking injunctive relief and damages against such authorized carrier pursuant to 49 U.S.C. § 14704(a)(1) and (2), as well as attorneys' fees and costs as authorized by 49 U.S.C. § 14704(e).

30.    The federal leasing regulations provide that the lease contain specific provisions and that the regulated motor carrier adhere to those terms.  49 C.F.R. §§ 376.11 and 376.12.  The Contracting Plaintiffs entered into federally-regulated lease agreements (the "Lease Agreements") with Defendant.   A genuine copy of the Lease Agreement entered between Landstar Inway and Plaintiff G. L. Brewer is attached as Exhibit "A."  On information and belief, the clauses in this Lease Agreement on which the causes of action in this complaint are based, are identical in all material respects to Lease Agreements entered into by the various defendants with the individuals in the potential class.

31.    49 C.F.R. § 376.12(h) provides that the lease "clearly specify all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation . . . together with a recitation as to how the amount of each item is to be computed." The lease also must recite that the lessor is to be afforded copies of those documents which are necessary to determine the validity of the charge.

## COUNT I

### Unlawful Provision of Transportation Services by Landstar

32.     Plaintiffs re-allege and incorporate the allegations of paragraphs 1 through 31.

33.     Under federal law, an "authorized carrier may perform authorized transportation in equipment it does not own only under the following conditions: . . . [t]here shall be a written lease granting the use of the equipment and meeting the requirements contained in § 376.12." 49 C.F.R. § 376.11(a).  Defendant Landstar is engaged in the unlawful provision of transportation services in equipment it does not own because the leases governing its use of such equipment fail to conform to 49 C.F.R. Part 376.

a.     Defendant's Lease Agreements with Plaintiffs do not contain certain provisions required by 49 C.F.R. § 376.12.  By way of illustration and not limitation:

1.     Defendant Landstar's Lease Agreements do not specify that, upon a driver's request, it will provide the driver with a copy of each insurance policy as required by C.F.R. § 376.12 (j)(2).

2.     Defendant Landstar's Lease Agreements do not properly specify the compensation given to owner-operators who haul Department of Defense shipments as required by 49 C.F.R. § 376.12(d).

b.     Defendant Landstar's Lease Agreements contain provisions that conflict with 49 C.F.R. § 376.12.  By way of illustration and not limitation,

1.     Defendant Landstar's Lease Agreements provide that it can deduct from the driver's compensation *any* amount the driver owes it, which provision conflicts with its obligation to specify all chargebacks in advance as required by 49 C.F.R. § 376.12 (h);

2.  Defendant's leases do not disclose the amount deducted from the owner-operator's compensation that exceeds the actual cost of the items initially paid for by the Defendant. The leases do not contain recitations as to how these deductions from compensation are calculated all in violation of 49 C.F.R. § 376.12 (h);

3.  Defendant Landstar's Lease Agreements provide that *all* indebtedness may be deducted from a driver's escrow, which provision conflicts with its obligation to specify with particularity the items for which the escrow can be used as required by 49 C.F.R. § 376.12 (k);

34.  As a direct and proximate result of this violation of federal law, the rights of Plaintiffs have been violated and Plaintiffs have suffered financial injury.

## COUNT II

**Unlawful Charge-backs to Compensation for Fuel Costs
And Comdata Fees
(in violation of 49 C.F.R. § 376.12 (h))**

35.  Plaintiffs re-allege and incorporate the allegations of paragraphs 1 through 31 above.

36.  Comdata, Inc is a Tennessee corporation that provides certain electronic credit and banking facilities to motor carriers. Comdata, Inc. issues cards to motor carriers for use by their drivers that are used to identify drivers eligible to enter transactions against the motor carrier's credit facility. Drivers use the Comdata cards to obtain electronic transfer of funds from the motor carrier and to acquire fuel and other items and services while on the road. Comdata imposes transaction charges on motor carriers for the use of its cards.

37.     Defendant has entered into an arrangement with Comdata, Inc., which, among other things, is intended to facilitate the acquisition of fuel by Contracting Plaintiffs and other owner-operators from various truck stops throughout the nation.   Pursuant to Defendant's arrangement with Comdata, Inc., Contracting Plaintiffs and other owner-operators procure fuel at various truck stops using credits made available to them on a Comdata Card issued to them by Landstar (Landstar Fuel Card).   Comdata, Inc. notifies Defendant of fuel acquired by Contracting Plaintiffs and other owner-operators using the Landstar Fuel Card.

38.     Defendant pays for the fuel acquired by the Contracting Plaintiffs and other owner-operators by making payments either to Comdata, Inc. or directly to the truck stop chain that dispensed the fuel to owner-operators.   Defendant then charges back an amount for such fuel against the compensation due Contracting Plaintiffs and other owner operators who use the Landstar Fuel Card.

39.     Through negotiations with either the truckstop or Comdata, Landstar obtains discounts or rebates from the price shown on the pump at the time fuel is dispensed to an owner-operator.   Landstar passes on only a portion of these discounts or rebates to owner-operators under lease to its operating companies.   The amount of discount or rebate passed on to owner-operators is set at preestablished rates shown in a document entitled "Rapid Rebate - Program Directory" published quarterly by Landstar and distributed to all owner-operators under lease to the Landstar operating companies.   The Contracting Plaintiffs' Landstar Fuel Card is charged the non-discounted price of the fuel.   The discount or rebate established for the Rapid Rebate-Program is subsequently passed on to the Contracting Plaintiffs and other owner-operators through a credit to their Landstar Fuel Card balance or to their weekly settlement statements.

11

40.    The discounts or rebates negotiated by Defendant with Comdata or with individual truck stops directly are generally greater than the discounts or rebates set out in the Rapid Rebate - Program Directory.  The sums charged back by Defendant to the Contracting Plaintiffs and other owner-operators for such fuel after the deduction of the discount or rebate identified in the Rapid Rebate - Program Directory are substantially greater than the amounts actually paid by the Defendant to Comdata or to individual truck stops for such fuel providing Defendant with a substantial undisclosed profit on the transaction.

41.    Comdata charges Landstar a fee each time Contracting Plaintiffs and other owner-operators use its services.  On information and belief, Comdata's fee for fuel purchases does not exceed $0.81 per transaction.  Comdata's fee for transferring cash to a Contracting Plaintiff and other owner-operators does not exceed $0.75 per transaction.   On information and belief, Landstar imposes a charge-back against the compensation of the Contracting Plaintiffs and other owner-operators of $1.75 per transaction.

42.    On information and belief, Landstar's Comdata program is identical in all material respects for all of its operating companies.  On information and belief, all owner-operators who have leases with any of the Landstar operating companies participate in Landstar's Comdata program.

43.    The lease does not disclose the amount by which the charge-backs by Defendant against Contracting Plaintiffs' compensation for fuel exceed the amount initially paid by Defendant for such fuel in violation of 49 C.F.R. § 376.12(h).  Defendant failed to afford Plaintiffs copies of those documents which are necessary to determine the validity of the charge-backs by Defendant against Contracting Plaintiffs' compensation for fuel in excess of amounts initially paid by Defendant for such fuel in violation of 49 C.F.R. § 376.12(h).  Defendant

illegally profited for charge-backs related to the purchase of fuel in violation of 49 C.F.R. § 376.12(h).

44.     The lease does not disclose the amount by which the charge-backs by Defendant against Contracting Plaintiffs' compensation for Comdata fees exceed the amount initially paid by Defendant for such fees in violation of 49 C.F.R. § 376.12(h). Defendant failed to afford Plaintiffs copies of those documents which are necessary to determine the validity of the charge-backs by Defendant against Contracting Plaintiffs' compensation for Comdata fees in excess of amounts initially paid by Defendant for such fees, in violation of 49 C.F.R. § 376.12(h). Defendant illegally profited from charge-backs related to use of Comdata cards.

45.     As a direct and proximate result of Landstar's violations of 49 C.F.R. § 376.12(h) owner-operators are deprived of sums rightfully belonging to them and have incurred substantial monetary damages.

## COUNT III

### Unlawful Reductions or Charge-Backs to Compensation for Third-Party Payor Costs Associated With Department of Defense Shipments (in violation of 49 C.F.R. § 376.12 (d) and (h))

46.     Plaintiffs re-allege and incorporate the allegations of paragraphs 1 through 31 above.

47.     The Department of Defense ("DOD") requires all motor carriers hauling DOD shipments to obtain the payment for their services through U.S. Bank's Power Track payment system. U.S. Bank charges a fee according to a sliding scale based on the cost of transporting shipments ranging from two percent for shipments costing under $600.00 to one percent for shipments costing over $2000.00. Landstar operating companies obtain payment for carrying DOD shipments through this payment system.

48.     Owner-operators working for Landstar operating companies are entitled to a percentage of the "adjusted gross revenue," which is based on revenue shown on the rated freight bill.

49.     Landstar operating companies charge back the U.S. Bank third-party payor cost to owner-operators carrying DOD freight by deducting two percent from the revenue shown on the rated freight bill for all DOD shipments before calculating the owner-operators' share of the revenue.  Landstar does not disclose this deduction on the owner-operators' settlement sheets.

50.     On information and belief, Landstar's third-party payor system is identical in all material respects for all of its operating companies.  On information and belief, Landstar reduces the compensation for all Landstar owner-operators who haul DOD shipments by deducting two percent from the revenue derived from the shipment even though in many cases the actual charge to Landstar is less than two percent.

51.     The Defendant's lease, in violation of 49 C.F.R. § 376.12(d), does not specify that owner-operator compensation will be reduced by first reducing the adjusted gross revenue derived from DOD shipments.

52.     The lease does not specify the charge-backs by Defendant against Contracting Plaintiffs' compensation for third-party payor costs associated with DOD shipments in violation of 49 C.F.R. § 376.12(h).  Defendant failed to afford Plaintiffs copies of those documents which are necessary to determine the validity of the charge-backs by Defendant against Contracting Plaintiffs' compensation for third-party payor costs associated with DOD shipments initially paid by Defendant in violation of 49 C.F.R. § 376.12(h).  Defendant illegally profited from charge-backs related to third-party payor costs associated with DOD shipments in violation of 49 C.F.R. § 376.12(h).

14

53.     As a direct and proximate result of Landstar's violations of 49 C.F.R. §376.12(d) and (h), owner-operators are deprived of sums rightfully belonging to them and have incurred substantial monetary damages.

## COUNT IV

**Unlawful Charge-Backs to Compensation for Base Plates and Permits
(in violation of 49 C.F.R. § 376.12 (h))**

54.     Plaintiffs re-allege and incorporate the allegations of paragraphs 1 through 31 above.

55.     Motor carriers operating commercial motor vehicles traveling in interstate commerce must obtain authority to travel in each state in which they operate.  The operator must obtain an annual "base" plate in a state in which it does business.  When applying for a base plate, the operator declares the states in which it expects to travel and the estimated miles that it expects to travel in each of those states.  The operator pays a fee to the base state that covers the taxes due in each of those states.  The base state shares the revenue with the other individual states based on the ratio of the declared estimated miles for a state to the total estimated miles for all states.

56.     On information and belief, Defendant Landstar uses Illinois as its base state for all of its operating companies.  Prior to April 1, 2001, Landstar charged  $1500 for all base plates sold to owner-operators working for the Landstar operating companies.  After that date, Landstar began charging $1600 for all base plates.  On information and belief, Landstar's cost for base plates is, and has been, less than $1500 for each commercial motor vehicle it licenses in Illinois.

57.     Prior to April 1, 2001, Landstar charged $250 to owner-operators for transferring or "reselling" their base plates when they left Landstar.  The State of Illinois charges $15 for transferring a base plate.

15

58.    In addition to the base plate, the operator of a commercial motor vehicle is required to obtain special permits if the vehicle carries certain regulated shipments such as hazardous materials and alcohol or operates in states that have additional permit requirements such as New York and New Mexico.

59.    Prior to January 1, 2001, Landstar charged $325 for an "annual permit package" that it provides to owner-operators to cover these special permits.  After that date Landstar began charging $340 for this package.  Landstar charges this fee to all owner-operators working for the Landstar operating companies whether or not the owner-operator requires these special permits. On information and belief, the cost of the individual permits total less than the amount charged by Landstar.

60.    On information and belief, Landstar's base plate and permit program is identical in all material respects for all of its operating companies.  On information and belief, the majority of owner-operators who have leases with any of the Landstar operating companies obtain their base plates and permits through Landstar.

61.    The lease does not disclose the amount by which the charge-backs by Defendant against Contracting Plaintiffs' compensation for base plates and permits exceed the amount initially paid by Defendant for such fees in violation of 49 C.F.R. § 376.12(h).  Defendant failed to afford Plaintiffs copies of those documents which are necessary to determine the validity of the charge-backs by Defendant against Contracting Plaintiffs' compensation for base plates and permits paid by Defendant in violation of 49 C.F.R. § 376.12(h).  Defendant illegally profited from charge-backs related to base plate and permit costs in violation of 49 C.F.R. § 376.12(h).

16

62.     As a direct and proximate result of Landstar's violations of 49 C.F.R. §376.12(h) owner-operators are deprived of sums rightfully belonging to them and have incurred substantial monetary damages.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs, OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC., G. L. BREWER, GERALD E. EIDAM, JR., CAREY R. LAUE, JAMES E. MICHAEL, ROBERT PENMAN and JAMES E. SCHMIDT, individually and on behalf of all others similarly situated, respectfully request that this Court:

1.     Enter a declaratory judgment that the leases Defendant entered into with Contracting Plaintiffs violate 49 C.F.R.§ 376.12 by failing to include certain required provisions and included others that conflict with that regulatory provision;

2.     Enter a declaratory judgment that Defendant has violated 49 C.F.R. § 376.12(d) and (h) by imposing excessive charge-backs on Contracting Plaintiffs for fuel transactions and Comdata fees, unauthorized reductions in compensation or excessive charge-backs for third-party payor costs for DOD shipments, and excessive charge-back costs associated with base plates and permits;

3.     Enter an Order that Defendant provide to Contracting Plaintiffs and Class Members an accounting of all transactions involving deductions from income or debits and credits to income for: (1) fuel transactions and Comdata fees, (2) third-party payor costs for DOD shipments, and (3) base plates and permits.  Enter an Order that further requires Defendant to recite how each charge against income was calculated while providing all documentation necessary to confirm the validity of the same transactions pursuant to 49 C.F.R. § 376.12(d), (h) and (j);

17

4.    Enjoin Defendant from violating Part 376 regulations;

5.    Certify a class comprised of lessors of motor vehicle equipment who, after November 1, 1998 and through the pendency of this proceeding are or have been parties to a Lease agreement with Defendant within the meaning of Part 376, Code of Federal Regulations.

6.    Enjoin Defendant from any acts of retaliation, harassment, or intimidation against Contracting Plaintiffs and Class Members and others who may assist and/or participate in this action;

7.    Enter judgment against Defendant in favor of Contracting Plaintiffs and individual class members for restitution and disgorgement of all charge-backs and other sums unlawfully deducted from compensation in violation of 49 C.F.R. § 376.12 and for damages, all pursuant to 49 U.S.C. § 14704(a)(2), and including pre- and post-judgment interest, as allowed by law;

8.    Create a common fund made up of all damages owed by Defendant to individual Class Members;

9.    Award reasonable attorneys' fees and expenses incurred in the prosecution of this action to be paid out of the common fund;

10.   Award reasonable attorneys' fees and expenses pursuant to 49 U.S.C. § 14704(e); and

11.   Award such other relief as this Court may deem to be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues triable as of right by a jury.

Respectfully submitted,

Paul D. Cullen, Sr.
Joseph A. Black
Daniel R. Unumb
THE CULLEN LAW FIRM, PLLC
1101 30th Street, N.W., Suite 300
Washington, D.C. 20007-3770
(202) 944-8600 (Telephone)
(202) 944-8611 (Telecopier)

Attorneys for Plaintiffs

SMITH HULSEY & BUSEY

By

Michael R. Freed

Florida Bar Number: 0069205
1800 First Union National Bank Tower
225 Water Street
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 facsimile

00399430.DOC

19



**LANDSTAR INWAY, INC.**
P.O. Box 7013
Rockford, Illinois 61125

# STATEMENT OF LEASE & RECEIPT FOR EQUIPMENT

I.    LANDSTAR INWAY, INC. ("CARRIER") (ICC Identification #MC-161864) and

*GL Brewer*
(INDEPENDENT CONTRACTOR'S NAME)

*690 Cortin Ln*
(INDEPENDENT CONTRACTOR'S ADDRESS)

*Sonoma,        Ca      95476*
(CITY)                    (STATE)            (ZIP CODE)

*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*
(INDEPENDENT CONTRACTOR'S FEIN#)

("INDEPENDENT CONTRACTOR") are parties to a written MOTOR VEHICLE AGREEMENT BETWEEN INDEPENDENT CONTRACTOR AND CARRIER (the "Agreement") whereby INDEPENDENT CONTRACTOR has leased to CARRIER the equipment specified in Section IV below (the "Equipment"), owned by INDEPENDENT CONTRACTOR, and INDEPENDENT CONTRACTOR is providing CARRIER as operator or operators of the Equipment for the purpose of loading.

II.   The original of the Agreement and of this document is on file at CARRIER's General Office, whose address is noted above. The second copy of this Statement of Lease and Receipt for Equipment is the Statement of Lease to be carried on the Equipment as required by 49 C.F.R. § 1057.11(c)(2). CARRIER verifies that the Equipment is being operated by CARRIER pursuant to the terms of the Agreement. There are no restrictions in the Agreement as to commodities that may be transported.

III.  **IDENTIFICATION OF EQUIPMENT:**

| TRACTOR ✓ New Lease or ___ Trade of Equip. | TRAILER ✓ New Lease or ___ Trade of Equip. |
|---|---|
| Number _4 3 7 2 1 3_ | Number _5 3 7 2 1 3_ |
| (TO BE ASSIGNED BY CARRIER) | (TO BE ASSIGNED BY CARRIER) |
| Make _Kenworth_ | Make _Doonan_ |
| Tractor Type: COE ___ or CONV ✓ | Trailer Type _S/D_    Model Year _97_ |
| Model Year _95_  Empty Weight _19,360_ | Serial Number _1098G4829V1208605_ |
| Serial Number _1XKWD09X4SR673346_ | Length _48'_   Empty Weight _11,200_ |

IV.   **RECEIPT OF EQUIPMENT:**  CARRIER hereby acknowledges receipt of the Equipment described above, which is the Equipment described in the Agreement.

Date _1-30-98_ By _Lori Roscoe_
(TO BE ENTERED BY CARRIER'S AUTHORIZED AGENT OR EMPLOYEE UPON APPROVAL BY THE GENERAL OFFICE)

Revised 1/18/95

**EXHIBIT A**

# MOTOR VEHICLE AND HAULAGE AGREEMENT
## BETWEEN INDEPENDENT CONTRACTOR AND LANDSTAR INWAY, INC.
### ("Agreement")

1    **EQUIPMENT:**  INDEPENDENT CONTRACTOR represents and warrants to CARRIER that it holds full legal title to or is otherwise authorized to contract the equipment identified in Section IV of the Statement of Lease and Receipt for Equipment (the "Equipment"), and further warrants and represents that the Equipment is in good, safe and efficient operating condition as required by government authorities and shall be so maintained at INDEPENDENT CONTRACTOR's expense throughout the duration of this Agreement.  The choice of location and persons to perform any necessary repairs or maintenance is exclusively vested with INDEPENDENT CONTRACTOR.  ALL POWER EQUIPMENT WHICH IS THE SUBJECT OF THIS AGREEMENT IS TO BE OPERATED BY FULLY QUALIFIED AND LICENSED OPERATORS TO BE PROVIDED BY INDEPENDENT CONTRACTOR AT ITS EXPENSE.

(a)    <u>Receipt for Equipment</u>.  Upon INDEPENDENT CONTRACTOR making available to CARRIER the Equipment, CARRIER shall furnish to INDEPENDENT CONTRACTOR the Statement of Lease and Receipt for Equipment, which shall constitute the receipt required by 49 C.F.R. § 376.11(b).  Upon termination of the Agreement, INDEPENDENT CONTRACTOR shall execute the same or similar Statement of Lease and Receipt for Equipment as the written receipt for the return of the Equipment by CARRIER to INDEPENDENT CONTRACTOR.  In the event that INDEPENDENT CONTRACTOR fails to submit the Statement of Lease and Receipt for Equipment upon termination of this Agreement, INDEPENDENT CONTRACTOR authorizes CARRIER to enter the time and date in Section VI of the Statement of Lease and Receipt for Equipment to evidence the return of the Equipment to INDEPENDENT CONTRACTOR by CARRIER.  If required by applicable federal, provincial or state law, INDEPENDENT CONTRACTOR shall name CARRIER on either the vehicle or plate portion of the vehicle permit, or include CARRIER on a statement of a lease between INDEPENDENT CONTRACTOR and a third party.  However, under no circumstances shall CARRIER be, or be deemed to be, liable for any lease payments whatsoever due or owed from INDEPENDENT CONTRACTOR to any third party.  In the event that CARRIER is found to be liable for such lease payments, INDEPENDENT CONTRACTOR shall fully indemnify CARRIER for any and all costs or damages imposed.

(b)    <u>Operation of Equipment</u>.  INDEPENDENT CONTRACTOR agrees to operate the Equipment in a safe and prudent manner at all times in accordance with the laws of the various jurisdictions in which it is operated and pursuant to the operating authorities of the CARRIER, and in accordance with all rules relating to traffic safety, highway protection and road requirements.

(c)    <u>Inspection and Maintenance of Equipment</u>.  INDEPENDENT CONTRACTOR agrees to maintain the Equipment, at its sole expense, in accordance with the safety and equipment standards specified in all applicable federal, provincial and state laws under which the Equipment is licensed to operate. INDEPENDENT CONTRACTOR shall, at its expense, make the Equipment available for inspection by CARRIER at a place designated by CARRIER.  Thereafter, as required by applicable federal law, INDEPENDENT CONTRACTOR shall make the Equipment available for inspection by CARRIER at least once every 120 days.  Providing that such inspection is done every 120 days and at a place designated by CARRIER, then CARRIER will pay for the expense of inspection.  If the Equipment is not inspected every 120 days, the Equipment will be placed out-of-service by CARRIER until the required inspection is completed, in which case the inspection shall be at INDEPENDENT CONTRACTOR's sole expense.  If any inspection reveals that the Equipment does not comply with applicable standards of federal, provincial or state law, the Equipment must be made to comply with such requirements by INDEPENDENT CONTRACTOR, at its expense, within a reasonable time as determined by CARRIER.  INDEPENDENT CONTRACTOR shall, at its sole expense, keep records of inspection, repair, and maintenance of the Equipment in accordance with the Federal Motor Carrier Safety Regulations (49 C.F.R. Part 396) and, if operated in Canada, applicable provincial regulations, and shall maintain all such records for the duration of this Agreement and for six (6) months thereafter.  INDEPENDENT CONTRACTOR shall, as directed by CARRIER, forward to CARRIER all maintenance records covering the Equipment required by applicable DOT or Canadian federal or provincial regulations.

(d)    <u>Painting or Marking of Equipment</u>.  If required by applicable federal, provincial or state law, INDEPENDENT CONTRACTOR shall cause the name, style, mark or logo of CARRIER to be affixed to the Equipment on the direction and in the manner prescribed by CARRIER.  INDEPENDENT CONTRACTOR shall be responsible for the cost of affixing such name, style, mark or logo and for the removal of same at the termination of this Agreement.

2.    **DURATION OF AGREEMENT:**  This Agreement shall be effective as of the date entered hereinbelow and shall remain in effect until terminated in accordance with the provisions of this Agreement.  The breach by either party of any of the provisions of this Agreement shall immediately terminate all provisions of this Agreement, except those provisions relating to indemnification of CARRIER by INDEPENDENT CONTRACTOR as contained in this Agreement, which indemnification provisions shall be effective at all times. Either party, by giving the other party twenty-four (24) hours written notice, may terminate this Agreement at any time    CARRIER may also terminate the Agreement

1

CONTRACT 01/16/98

immediately by oral notice followed by written notice to INDEPENDENT CONTRACTOR. Acceptance of tender of load after the effective date of this Agreement shall indicate understanding and acceptance by INDEPENDENT CONTRACTOR of the terms and conditions of this Agreement. INDEPENDENT CONTRACTOR shall ensure that any worker employed or utilized by INDEPENDENT CONTRACTOR to provide services under this Agreement complies with the terms and conditions of this Agreement. Although this Agreement does not contain a stated date of termination, the parties agree that they are not creating a permanent or indefinite relationship.

3.    **EXCLUSIVE POSSESSION AND RESPONSIBILITY:** The Equipment shall be for CARRIER's exclusive possession, control and use for the duration of this Agreement. This provision is set forth solely to conform with Federal Highway Administration regulations and shall not be used for any other purposes, including any attempt to classify INDEPENDENT CONTRACTOR or its workers as employees of CARRIER. Nothing in the provisions required by 49 C.F.R. § 376.12(c)(1) is intended as evidence that the INDEPENDENT CONTRACTOR or any worker provided by INDEPENDENT CONTRACTOR is an employee of CARRIER. During the term of this Agreement, CARRIER shall have the exclusive right to subcontract the Equipment to other authorized motor carriers. INDEPENDENT CONTRACTOR may only subcontract or trip lease the Equipment upon prior written authorization received from CARRIER as set forth in Paragraph 19. CARRIER has no right to and will not control the manner nor prescribe the method of doing that portion of the operation which is contracted for in this Agreement by INDEPENDENT CONTRACTOR, except such control as can reasonably be construed to be required by all applicable laws and regulations. INDEPENDENT CONTRACTOR reserves the right to accept or reject any freight tendered for transportation by CARRIER.

4.    **COMPENSATION:** It is expressly understood and agreed that INDEPENDENT CONTRACTOR's compensation shall be as set forth in Appendix A and such compensation shall constitute the total compensation for everything furnished, provided, or done by INDEPENDENT CONTRACTOR in connection with this Agreement, including the services of its drivers. All mileage computations shall be based on CARRIER's mileage guide.

   (a)    Settlements. CARRIER shall settle with INDEPENDENT CONTRACTOR with respect to services provided under this Agreement within fifteen (15) calendar days after INDEPENDENT CONTRACTOR's submission, in proper form, of those documents necessary for CARRIER to secure payment from CARRIER's customers, including the bill of lading, signed delivery receipt or other proof of delivery acceptable to CARRIER, and properly completed driver logs as required by applicable federal, provincial or state law, and, in the case of C.O.D. shipments, delivery of the certified check or money order due to CARRIER. CARRIER will provide INDEPENDENT CONTRACTOR, at or before the time of settlement, a copy of the applicable rated freight bill, bills of lading (in the case of Canadian originating shipments) any other applicable document from which rates or charges are computed, or a computer-generated document containing the same information. INDEPENDENT CONTRACTOR may view during CARRIER's normal business hours a copy of any such applicable freight bill or other document. CARRIER may, at its discretion, delete the names of shippers and consignees shown on any such underlying document to be inspected by INDEPENDENT CONTRACTOR. Upon termination of this Agreement, CARRIER will withhold the final settlement due to INDEPENDENT CONTRACTOR, if any, under this Agreement until INDEPENDENT CONTRACTOR returns to CARRIER the identification devices INDEPENDENT CONTRACTOR is required to return to CARRIER pursuant to Paragraph 6 of this Agreement. In the event that the identification devices have been lost or stolen, a letter certifying their removal will satisfy this requirement for purposes of issuing final settlement to INDEPENDENT CONTRACTOR.

   (b)    Pre-Trip Settlement. Where INDEPENDENT CONTRACTOR has secured a pre-trip settlement of any kind from CARRIER, or if there shall be any other amounts due CARRIER from INDEPENDENT CONTRACTOR or its workers pursuant to this Agreement, including but not limited to, operational expenses set forth in Paragraph 7, cargo claims, property damage, towing charges, requested clothing items, vehicle repairs, tires, Equipment cleaning expenses, and deductions for any insurance related costs, CARRIER shall be authorized to deduct the amount of such pre-trip settlement or other amount due CARRIER from any settlement, escrow fund, or any monies due or becoming due to INDEPENDENT CONTRACTOR from CARRIER under this Agreement, and if such monies are insufficient to cover the total amount due CARRIER, then INDEPENDENT CONTRACTOR will on demand pay to CARRIER all sums remaining due to CARRIER, together with interest at the maximum legal rate and any expense, including reasonable attorney fees, incurred by CARRIER in recovering such amounts from INDEPENDENT CONTRACTOR. INDEPENDENT CONTRACTOR and its workers shall not charge any purchase to CARRIER and, in the event INDEPENDENT CONTRACTOR or its workers do charge any purchase to CARRIER, such sums paid by CARRIER shall be treated as a Pre-Trip Settlement made to INDEPENDENT CONTRACTOR and shall be recoverable by CARRIER under this provision. INDEPENDENT CONTRACTOR authorizes CARRIER to make pre-trip settlements in compensation requested by INDEPENDENT CONTRACTOR or its workers directly to INDEPENDENT CONTRACTOR's workers, provided, however, that CARRIER has complete discretion as to whether to issue a pre-trip settlement and the amount of any pre-trip settlement. In no event shall CARRIER make a pre-trip settlement to INDEPENDENT CONTRACTOR of more than 30% of INDEPENDENT CONTRACTOR's adjusted gross revenue as set forth in Appendix A. CARRIER shall furnish INDEPENDENT CONTRACTOR a written explanation and itemization of all deductions and chargebacks made under this provision. All comcnek (or similar service) Pre-Trip Settlements requested by INDEPENDENT CONTRACTOR shall be subject to a fee of Three Dollars ($3.00) for each

2

such settlement. Pre-Trip settlements pre-loaded onto INDEPENDENT CONTRACTOR's fuel card shall be subject to a fee of One Dollar and Seventy-Five Cents ($1.75) for each such settlement. CARRIER will be deemed to have a lien against monies in its possession which are receivables to the INDEPENDENT CONTRACTOR to cover any monies advanced or paid by CARRIER for items which are INDEPENDENT CONTRACTOR's responsibility.

(c)  Other Costs and Deductions/Multiple Contracts. INDEPENDENT CONTRACTOR, at the time of signing this Agreement or at any time thereafter, may authorize CARRIER to make additional deductions not set forth in this Agreement from settlements due INDEPENDENT CONTRACTOR. In such case, a copy of the signed authorization to make such additional deduction, specifying the amounts, terms, and conditions thereof, shall be attached to and made a part of this Agreement. CARRIER shall furnish INDEPENDENT CONTRACTOR with a written explanation and itemization of all deductions made from settlements due INDEPENDENT CONTRACTOR under this Agreement. If INDEPENDENT CONTRACTOR has more than one agreement with CARRIER, INDEPENDENT CONTRACTOR understands and acknowledges that CARRIER may make deductions from trip settlements due, and escrow funds held for, INDEPENDENT CONTRACTOR for any monies due CARRIER under the terms of any agreement.

(d)  In addition to certain insurance coverages, INDEPENDENT CONTRACTOR is required to provide at its sole cost all Equipment, accessories or devices required for the operation of the Equipment. In the event INDEPENDENT CONTRACTOR elects to purchase, lease or finance such Equipment, accessories or devices from CARRIER or a commonly owned company, the terms of Appendix C of this Agreement shall apply.

5.  ESCROW·  INDEPENDENT CONTRACTOR and CARRIER shall establish an escrow fund. The total amount of such escrow fund shall be Five Hundred Dollars ($500) per unit, which amount will be deducted from INDEPENDENT CONTRACTOR'S compensation within a fifteen (15) week period. Such escrow fund shall be returned to INDEPENDENT CONTRACTOR only upon termination of this Agreement and the balance due shall be refunded not later than forty-five (45) days after such termination, provided the four (4) following listed conditions are complied with by INDEPENDENT CONTRACTOR:

(1)  Return to CARRIER of all identification devices;

(2)  Return of base plate and permits as required herein;

(3)  Return of all signed delivery receipts for all shipments not previously forwarded to CARRIER; and

(4)  Return of all other property of CARRIER.

The escrow fund may at any time be applied by CARRIER to satisfy any claims or debts owed by INDEPENDENT CONTRACTOR pursuant to the terms of this Agreement, including but not limited to advances made to INDEPENDENT CONTRACTOR or its workers, cargo claims, property damage or trailer damage claims, insurance costs, and the cash value of permits not returned to CARRIER. CARRIER shall provide an accounting to INDEPENDENT CONTRACTOR of any transaction involving the escrow fund, which accounting shall be shown on the settlement sheet produced at the time the transaction is made. INDEPENDENT CONTRACTOR may at any time request and receive an accounting for transactions involving the escrow fund. CARRIER shall pay interest on the escrow funds on a quarterly basis, which shall be established on the date the interest period begins and shall be equal to the average yield of 91 day, 13 week treasury bills, as established in the then most recent weekly auction by the Department of Treasury. For Canadian resident contractors only, the interest shall be at a rate equal to the average annual yield of 90 day treasury bills sold on the first date prior to such payment date on which the Canadian Federal Minister of Finance accepts tender for the purpose of 90 day treasury bills. For purposes of calculating the amount of the escrow fund on which interest will be paid, CARRIER will deduct a sum equal to the average advance made to INDEPENDENT CONTRACTOR during the period of time for which the interest is due.

6.  IDENTIFICATION DEVICES:  All identification devices of CARRIER required by any law or regulation shall be secured in the name of CARRIER and shall be displayed on the Equipment, at INDEPENDENT CONTRACTOR'S expense, in accordance with all applicable regulations during the term of this Agreement. All identification devices and documents are the sole property of CARRIER. Any such identification shall be removed from the Equipment by INDEPENDENT CONTRACTOR and returned to CARRIER by first class mail addressed to CARRIER's address or in person immediately upon termination of this Agreement. The parties agree that, in addition to any other right, remedy or claim CARRIER may have, INDEPENDENT CONTRACTOR shall pay CARRIER Twenty-Five Dollars ($25.00) per day for INDEPENDENT CONTRACTOR's failure to remove and/or return all identification devices to CARRIER upon termination of this Agreement.

7.  OPERATIONAL EXPENSES:  Except as otherwise provided in this Agreement, INDEPENDENT CONTRACTOR shall furnish, provide and pay all operational expenses including, but not limited to, the items listed in this paragraph. In the event CARRIER is called upon to pay any of these operational expenses on behalf of INDEPENDENT CONTRACTOR, such payment shall be considered a Pre-Trip Settlement to INDEPENDENT CONTRACTOR (and a cost of operation) and CARRIER shall be entitled to seek reimbursement from INDEPENDENT CONTRACTOR or to charge back the payment as set forth in paragraph 4(b). Operational expenses include, but are not limited to, the following:

(a)  All fuel, oil, tires and all equipment, accessories, or devices used in connection

3

with the operation of the Equipment.

(b)  All maintenance costs including all repairs;

(c)  All taxes and assessments, insurance costs and other payments due by reason of the payment by INDEPENDENT CONTRACTOR of wages or other earnings to its workers;

(d)  Base plates, including apportioned or prorated base plates, fuel permits and all other permits required to operate the Equipment (except overdimension/overweight permits), empty miles, detention, accessorial charges, licenses, and all tax payments with respect to the Equipment or on the use or operation thereof, including all reports required of INDEPENDENT CONTRACTOR connected therewith, and all ferry, bridge and highway tolls;

(e)  Fuel and Fuel Use Taxes, and Ton Mile/Mileage Taxes;

(f)  All fines and penalties resulting from acts or omissions of INDEPENDENT CONTRACTOR, including any monies paid by CARRIER in the form of penalties to a government or regulatory body because of some act or omission on the part of INDEPENDENT CONTRACTOR or its workers;

(g)  All insurance costs relating to insurance coverage required by this Agreement or otherwise requested by INDEPENDENT CONTRACTOR from CARRIER;

(h)  Federal Highway Use Tax on the Equipment; federal, provincial, state and city income taxes; and, any self-employment or payroll taxes;

(i)  All sales, use, excise and other taxes due to ownership or operation of Equipment in the jurisdiction imposing such taxes, including federal goods and services tax and all applicable provincial taxes;

(j)  All other expenses incurred in the operation of the Equipment, including, but not limited to, empty mileage, expenses incurred to transfer any shipment and/or secure additional equipment to complete delivery in case of breakdown or delay;

(k)  In the event that the duration of this Agreement is less than six (6) months, INDEPENDENT CONTRACTOR shall be responsible for the costs related to all prequalification drug and alcohol tests required by applicable law.

8.  **LOADING AND UNLOADING:** INDEPENDENT CONTRACTOR shall be responsible for the loading and unloading of all shipments transported under this Agreement at INDEPENDENT CONTRACTOR's expense, unless otherwise specified in Paragraph 4 or Appendix A of this Agreement.

9.  **OVERWEIGHT/OVERDIMENSION SHIPMENTS:** CARRIER shall provide all required overweight/overdimension permits to INDEPENDENT CONTRACTOR, provided, however, that INDEPENDENT CONTRACTOR shall have the duty to determine that its load is in compliance with the size and weight laws of the jurisdictions in which it will travel and to notify CARRIER if the vehicle is overweight or in need of permits before commencing transportation. Except when a violation results from the acts or omissions of INDEPENDENT CONTRACTOR, CARRIER shall assume the risks and costs of fines for overweight and oversize trailers when the trailers are preloaded, sealed or the load is containerized, or when the trailer or lading is otherwise outside INDEPENDENT CONTRACTOR's control, or for improperly permitted overdimension and overweight loads, and CARRIER shall reimburse INDEPENDENT CONTRACTOR for any fines therefor paid by INDEPENDENT CONTRACTOR. INDEPENDENT CONTRACTOR shall reimburse CARRIER for any costs or penalties paid by CARRIER due to INDEPENDENT CONTRACTOR's failure to comply with the terms of any permit or INDEPENDENT CONTRACTOR's failure to pick up permits made available by CARRIER.

10.  **LICENSE PLATES:** Unless INDEPENDENT CONTRACTOR already has obtained a valid base plate under the International Registration Plan ("IRP") or, for Canadian resident contractors, the Canadian Agreement on Vehicle Registration ("CAVR"), CARRIER shall obtain such plate in CARRIER's name for use by INDEPENDENT CONTRACTOR, in which case the amount specified in Appendix A per tractor per year (or a pro rata based amount for a partial year plate) shall be deducted from INDEPENDENT CONTRACTOR's compensation within an eighteen (18) week period beginning with the fifth weekly settlement made pursuant to this Agreement. If CARRIER receives a refund or credit for an IRP or CAVR plate registered in the name of CARRIER, or if such base plate is authorized by INDEPENDENT CONTRACTOR to be resold by CARRIER to another contractor, CARRIER shall refund to INDEPENDENT CONTRACTOR a pro rata share of the amount received by CARRIER less a transfer fee of $125.00 per plate. INDEPENDENT CONTRACTOR shall not be entitled to reimbursement for an unused portion of a base plate, however, unless CARRIER is able to reuse or resell the plate to another contractor.

11.  **PERMITS:** CARRIER shall provide INDEPENDENT CONTRACTOR with all necessary permits, and shall charge INDEPENDENT CONTRACTOR the amount specified in Appendix A per tractor per year, which charge shall be deducted from INDEPENDENT CONTRACTOR's compensation within an eighteen (18) week period beginning with the fifth weekly settlement made pursuant to this Agreement. All permits certificates and licenses issued in CARRIER's name shall be returned to CARRIER upon termination of this Agreement. No refund shall be made to INDEPENDENT CONTRACTOR of the permit costs upon termination of this Agreement. INDEPENDENT CONTRACTOR shall be liable to CARRIER for any expense caused to CARRIER by INDEPENDENT CONTRACTOR's failure to return all permits required by this provision

4

12.   **FUEL USE AND MILEAGE TAXES**:  INDEPENDENT CONTRACTOR shall be responsible for all Fuel Use and Mileage Taxes incurred due to the operation of the Equipment under this Agreement, provided, however, that CARRIER shall prepare and file all reports required under the International Fuel Tax Agreement or other applicable state or provincial law on behalf of INDEPENDENT CONTRACTOR pursuant to the procedures set forth in **Appendix E**.

13.   **SELECTION OF INDEPENDENT CONTRACTOR'S SUPPLIERS**:  INDEPENDENT CONTRACTOR is not required to purchase or rent any products, equipment or services from CARRIER as a condition of entering into this Agreement.

14.   **INSURANCE**:  The responsibilities and obligations between CARRIER and INDEPENDENT CONTRACTOR involving insurance shall be as specified in **Appendix B**.  CARRIER shall have no insurance responsibilities or obligations pertaining to INDEPENDENT CONTRACTOR or the Equipment other than those expressly stated in this Agreement or mandated by law.

15.   **LOSS OR DAMAGE CLAIMS**:  INDEPENDENT CONTRACTOR shall be responsible to CARRIER for any loss, damage or delay claim incurred during the term of this Agreement as follows:

(a)   **Personal Injury and Property Damage**.  Personal injury and/or property damage claims due, in whole or in part, to INDEPENDENT CONTRACTOR's or its workers' negligence, as determined by CARRIER, will be charged to INDEPENDENT CONTRACTOR up to One Thousand Dollars ($1,000.00) per claim, when such claims arise out of INDEPENDENT CONTRACTOR's or its workers' operation of the Equipment on a public highway or road.  Personal injury and/or property damage claims due, in whole or in part, to INDEPENDENT CONTRACTOR's or its workers' negligence, as determined by CARRIER, will be charged to INDEPENDENT CONTRACTOR up to Two Thousand Dollars ($2,000.00) per claim, when such claims arise out of INDEPENDENT CONTRACTOR's or its workers' operation of the Equipment on private or governmental property other than a public highway or road.

(b)   **Trailer Damage**.  If INDEPENDENT CONTRACTOR or its workers are permitted to use a trailer which is the property of, interchanged to, or furnished by CARRIER and the trailer is damaged or destroyed, INDEPENDENT CONTRACTOR shall be responsible for the damage or loss, provided, however, that CARRIER agrees to limit INDEPENDENT CONTRACTOR's liability for damage to such trailers furnished by CARRIER to One Thousand Dollars ($1,000.00) per incident.  This liability limitation shall not apply, however, if the damage is caused, in whole or in part, by any willful or intentional act of INDEPENDENT CONTRACTOR or its workers, or if the driver of the Equipment was not qualified and/or approved by CARRIER at the time of the incident.

(c)   **Cargo Damage**.  INDEPENDENT CONTRACTOR shall be responsible for any claim resulting from cargo shortages, cargo damage, or delays in transporting shipments due, in whole or in part, to the negligence of INDEPENDENT CONTRACTOR or its workers, as determined by CARRIER, provided, however, that CARRIER agrees to limit INDEPENDENT CONTRACTOR's liability for any cargo claim to One Thousand Dollars ($1,000.00) per shipment.  This liability limitation shall not apply, however, if the damage is caused, in whole or in part, by any willful or intentional act of INDEPENDENT CONTRACTOR or its workers, or if the driver of the Equipment was not qualified and/or approved by CARRIER at the time of the incident.

(d)   **Clean-Up Expenses**  INDEPENDENT CONTRACTOR shall be responsible for all costs of cleaning up any accident or spill, including but not limited to diesel fuel spills, involving the Equipment or the services provided by INDEPENDENT CONTRACTOR under this Agreement, provided, however, that CARRIER agrees to limit INDEPENDENT CONTRACTOR's liability for each such incident to Two Thousand Dollars ($2,000.00).  This liability limitation shall not apply, however, if the damage is caused, in whole or in part, by any willful or intentional act of INDEPENDENT CONTRACTOR or its workers, or if the driver of the Equipment was not qualified and/or approved by CARRIER at the time of the incident.

(e)   **Miscellaneous**.  INDEPENDENT CONTRACTOR's liability under subparagraphs (a), (b), (c) and (d) above shall not exceed Two Thousand Dollars ($2,000.00) for any single incident, provided, however, that this liability limitation shall not apply if the incident is caused in whole or in part, as determined by CARRIER, by any willful or intentional act of INDEPENDENT CONTRACTOR or its workers, or if the driver of the Equipment was not qualified and/or approved by CARRIER at the time of the incident.

16.   **INDEPENDENT CONTRACTOR RELATIONSHIP**:  This Agreement is intended by the parties to create the relationship of CARRIER and INDEPENDENT CONTRACTOR and not that of an employer/employee nor master/servant relationship.  Neither INDEPENDENT CONTRACTOR, its workers, nor any individual providing services of any kind to INDEPENDENT CONTRACTOR, are to be considered employees of CARRIER at any time, under any circumstances or for any purpose.  INDEPENDENT CONTRACTOR unconditionally waives and releases CARRIER, and any third-party employee benefit fund that provides benefits to any of CARRIER's current or former employees, from any claim for benefits based on any past services rendered to CARRIER under this Agreement.  INDEPENDENT CONTRACTOR shall assume full and complete responsibility for all workers utilized by it in the performance of all obligations under this Agreement.  In recognition of the independent contractor relationship which exists between the

parties, it is acknowledged that INDEPENDENT CONTRACTOR has the right to determine the manner and means of performing all work hereunder. INDEPENDENT CONTRACTOR has the right to decide what work to perform under this Agreement, provided, however, that when work is accepted by INDEPENDENT CONTRACTOR the work will be performed in accordance with the terms of this Agreement, the requirements, if any, of CARRIER's customers, and all applicable laws and governmental regulations. In no event shall any contracts or statements of CARRIER be deemed, construed or implied to control, direct, or infringe on INDEPENDENT CONTRACTOR's right to control or actually control the manner and means of INDEPENDENT CONTRACTOR's performance of the services contemplated in this Agreement. INDEPENDENT CONTRACTOR further agrees to defend, indemnify and hold CARRIER harmless from any claims, demands, suits, or actions brought by any workers, any union, the public, or state, provincial or federal agencies, arising out of the operation of the Equipment or the provision of driver services pursuant to this Agreement.

17.    **PASSENGERS:** No passenger shall be permitted to travel in the Equipment without prior written authorization from CARRIER. Any passenger authorized by CARRIER must be a minimum of 18 years of age, and must sign a waiver of liability as provided in the Passenger Authorization Form to be provided by CARRIER. In no event shall more than one authorized passenger be permitted at any one time.

18.    **REFLECTIVE TAPE MARKINGS:** In order to ensure safe operations on the highways, INDEPENDENT CONTRACTOR agrees that all trailing equipment provided to CARRIER by INDEPENDENT CONTRACTOR shall be properly marked with reflective tape as specified by CARRIER or as may be required by applicable law.

19.    **SUBCONTRACTING/TRIP-LEASING:** INDEPENDENT CONTRACTOR may trip-lease or subcontract the Equipment to a third party other than a subsidiary of CARRIER only upon receiving prior written authorization from CARRIER. The following procedures shall apply to any trip-lease or subcontract situation:

In order to request authorization from CARRIER for any trip-lease, INDEPENDENT CONTRACTOR shall:

1)    Obtain valid carrier information (name, address, identification number, phone number, contact person of carrier);

2)    Call CARRIER's main office and provide CARRIER with information about the carrier and about the load;

3)    Receive and record release number, if trip lease is approved. In the event that a trip-lease is not approved, a release number will not be given and INDEPENDENT CONTRACTOR may not enter into a trip-lease agreement; and

4)    Any payments in advance offered to INDEPENDENT CONTRACTOR by any other carrier must be refused.

Upon delivery of any trip-lease load, INDEPENDENT CONTRACTOR shall:

1)    Obtain a signed proof of delivery;

2)    Indicate release number on each piece of paperwork; and

3)    Mail all paperwork, including a copy of the signed-off trip-lease agreement, placards, shipping order or bill of lading, delivery receipt and logs to the designated representative of CARRIER.

CARRIER assumes no responsibility for the collection of freight charges or payment to INDEPENDENT CONTRACTOR of any trip-lease related revenue unless this provision is complied with by INDEPENDENT CONTRACTOR. During the term of any trip-lease, INDEPENDENT CONTRACTOR shall remove or cover up all of CARRIER's identification on the Equipment, and CARRIER shall have no responsibility for, and INDEPENDENT CONTRACTOR shall fully indemnify CARRIER regarding, the operation of the Equipment in respect to the public, shippers, and governmental regulations during the term of such trip-lease.

20.    **UNAUTHORIZED USE OF EQUIPMENT:** If, during the term of this Agreement, INDEPENDENT CONTRACTOR or its workers operate any Equipment in any manner varying from the regulations or beyond the scope of the operating authority of CARRIER, or uses the Equipment for its own purposes, or for benefit of a third party other than CARRIER (except as allowed in Paragraph 19) or for any other purpose not permitted by this Agreement, then this Agreement shall, at CARRIER's option, be deemed terminated as of the time that such unauthorized use occurred, and all obligations and liabilities of CARRIER under this Agreement shall be deemed to have ceased and terminated as of the time of such unauthorized use, except for any and all provisions regarding the indemnification of CARRIER by INDEPENDENT CONTRACTOR which provisions shall survive the termination of this Agreement. Nothing in this Agreement shall prohibit INDEPENDENT CONTRACTOR from rendering services as a driver to any third party. If INDEPENDENT CONTRACTOR renders services as a driver to another company, INDEPENDENT CONTRACTOR shall include such time on all driver logs submitted to CARRIER as required by federal, provincial or state law. Failure to comply with these requirements may result in the immediate termination of this Agreement by CARRIER.

21.    **TRAILER UTILIZATION PROGRAM:** INDEPENDENT CONTRACTOR may utilize CARRIER's trailers under

CONTRACT 01/16/98

the Trailer Utilization program described in <u>Appendix D</u>.

22    DUE DILIGENCE AND COOPERATION WITH CARRIER ON CLAIMS:

    (a)    <u>Cargo Claims</u>.  INDEPENDENT CONTRACTOR warrants that all cargo loaded on the Equipment shall be delivered to the consignee with reasonable diligence, speed and care and as may be required by the shipper or on the bill of lading.  INDEPENDENT CONTRACTOR or its driver shall immediately report any cargo exceptions or damages to CARRIER.

    (b)    <u>Accidents</u>.  INDEPENDENT CONTRACTOR or its driver shall notify CARRIER immediately of any property damage and any incident or accident involving any pedestrian or occupant of any type of vehicle, whether or not the incident or accident appears to have resulted in personal injury and whether or not INDEPENDENT CONTRACTOR appears to be at fault.

    (c)    <u>Roadside Inspections</u>  INDEPENDENT CONTRACTOR or its driver shall notify CARRIER in a timely fashion of any roadside inspection of the Equipment and the results thereof, and INDEPENDENT CONTRACTOR shall provide CARRIER with a copy of the roadside inspection report received in connection with each such inspection.

    (d)    <u>Notice of Infractions, Claims or Suits</u>.  INDEPENDENT CONTRACTOR shall forward immediately to CARRIER every demand, notice, summons, ticket or other legal process received by INDEPENDENT CONTRACTOR that involves a charge, infraction, claim, suit or other legal proceeding arising from the operation of the Equipment, the relationship created by this Agreement or the services performed hereunder.

    (e)    <u>Independent Contractor's Assistance and Cooperation</u>.  INDEPENDENT CONTRACTOR and its driver shall cooperate fully with CARRIER in the conduct of any legal action, regulatory hearing or other similar process arising from the operation of the Equipment, the relationship created by this Agreement or the services performed hereunder.  INDEPENDENT CONTRACTOR shall, upon CARRIER's request, provide written reports or affidavits, attend hearings and trials and assist in securing evidence or obtaining the attendance of witnesses.  INDEPENDENT CONTRACTOR shall provide CARRIER with any assistance as may be necessary for CARRIER or CARRIER's representatives or insurers to investigate, settle or litigate any accident, claim or potential claim by or against CARRIER.

23.    C.O.D. SHIPMENTS:  In handling C.O.D. or order/notify shipments, INDEPENDENT CONTRACTOR or its workers shall perform as indicated on the shipping order, call the originating terminal to report the C.O.D. or order/notify shipment; accept only a certified check, cashier's check or United States or Canadian Postal money order made payable to CARRIER for the shipment; and, remit to CARRIER no later than the next business day after the delivery date the full amount specified on the freight bill, including transportation and C.O.D. charges.  In the event that INDEPENDENT CONTRACTOR accepts any other method of payment, INDEPENDENT CONTRACTOR shall bear the risk of loss.  In the event of non-delivery of such a shipment, INDEPENDENT CONTRACTOR or its workers shall advise CARRIER of such non-delivery no later than the next business day following the day of attempted delivery or collection.

24.    EQUAL EMPLOYMENT OPPORTUNITY:  The services and Equipment specified herein will be furnished by INDEPENDENT CONTRACTOR in full compliance with all applicable federal, provincial, state and local laws and regulations pertaining to government contracts and subcontracts, including, without limitation, Executive Order 11246.

25    GOVERNING LAW AND ARBITRATION:  This Agreement is to be governed by the laws of the State of Illinois.  Any dispute arising out of or relating to this Agreement, including any allegation of breach thereof, shall be fully and finally resolved by arbitration in accordance with Illinois' arbitration act, and the arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA").  A Demand for Arbitration shall be filed with the AAA's office located in or closest to Rockford, Illinois, and shall be filed not later than one year after the dispute arises or the claim accrues.  Failure to file the Demand within the one year period shall be deemed a full waiver of the claim  The place of the arbitration hearing shall be Rockford, Illinois.  Both parties agree to be fully and finally bound by the arbitration award, and, where allowed by law, judgment may be entered on the award in any court having jurisdiction thereof.  All dollar amounts specified in this Agreement are based on U.S. Dollars.

26.    ENTIRE AGREEMENT:  This Agreement contains the entire agreement between CARRIER and INDEPENDENT CONTRACTOR and supersedes, cancels and revokes all other contracts between the parties relating to the Equipment and any other contract which is alleged to cover any services rendered by INDEPENDENT CONTRACTOR to CARRIER, or to which INDEPENDENT CONTRACTOR is alleged to be a third-party beneficiary as a result of any services rendered to CARRIER, provided, however, that the parties may amend or modify this Agreement in writing signed by both parties or, with respect to modification of any chargeback item, as allowed for in <u>Appendix A</u> of this Agreement.

27.    SEVERABILITY AND SAVINGS:  If any sections, part or parts of sections of this Agreement are deemed invalid for any reason whatsoever, the provisions of this Agreement shall be void only as to such section, sections or part, or parts of sections, and this Agreement shall remain otherwise binding between the parties hereto.  Any section, or part or parts of sections voided by operation

7

CONTRACT 01/18/98

of the foregoing shall be replaced with provisions which shall be as close as the parties' original intent as permitted under applicable law.

28.    NON-WAIVER: The failure or refusal of either party to insist upon the strict performance of any provision of this Agreement, or to exercise any right in any one or more instances or circumstances shall not be construed as a waiver or relinquishment of such provision or right, nor shall such failure or refusal be deemed a custom or practice contrary to such provision or right.

29.    NOTICES: Any notice required or permitted by this Agreement shall be deemed conclusively to have been given when deposited in the United States or Canada Mail properly addressed with first class postage prepaid. The address of each party shall be that set forth on the Attached Statement, and the address to which notices are to be sent may be changed by providing the other party notice of change of address. Where INDEPENDENT CONTRACTOR provides notice of change of its address, the change of address will be effective upon CARRIER's sending acknowledgment of the notice.

30    TERMINATION: The INDEPENDENT CONTRACTOR will, at the time this Agreement is terminated, remove all CARRIER identification from the Equipment and return all of CARRIER's property and freight to CARRIER's nearest terminal, including trailers, chains, binders, and tarps and placards. Plates and permits must be returned to the Permit Department in Rockford, Illinois. If INDEPENDENT CONTRACTOR fails to return CARRIER's property or freight to CARRIER or remove all CARRIER identification from the equipment to CARRIER within fifteen (15) days after termination of this Contract, INDEPENDENT CONTRACTOR will pay CARRIER an initial payment of damage in the amount of $1,000.00, as a pre-estimate of damages and not as a penalty, and CARRIER may pursue all other remedies allowed by law or authorized in the Agreement against INDEPENDENT CONTRACTOR. If INDEPENDENT CONTRACTOR fails to perform its obligations under this Agreement, CARRIER may, in addition to any other remedy provided by law or under this Agreement, complete INDEPENDENT CONTRACTOR's obligations and charge INDEPENDENT CONTRACTOR for any expenses associated with completing INDEPENDENT CONTRACTOR's obligations.

Les parties ont specifiquement requis que la presente convention de meme que tous les documents s'y rattachant soitent redigees en langue anglais seulement.

The parties have specifically requested that this Agreement and all documents hereto be drafted in the English language only.

IN WITNESS WHEREOF, CARRIER and INDEPENDENT CONTRACTOR do hereby sign this Agreement on this _29_ day of _Jan_ , 199_8_ , the effective date of this Agreement.

LANDSTAR INWAY, INC.                    _GL Brewer_
CARRIER                                 INDEPENDENT CONTRACTOR

                                        _GL Brewer_

Signature                               Signature

IRS W-9 Certification: Under penalties of perjury, I certify that the number shown on this form is my correct tax payer identification number and I am not subject to backup withholdings according to the Internal Revenue Service (IRS).

_68-0048114_  _GL Brewer_
(DBA - Name that matches SS# or FID# used below)

_68-0048114_
(Social Security Number or Federal I.D. Number)
(This number will be used on Federal Form 1099)

Corporation _____  Individual _✓_ Partnership ___

## APPENDIX A

### Compensation

(a)  **Contractor's Share of Revenue**: Unless otherwise agreed to in writing between the parties, CARRIER shall pay INDEPENDENT CONTRACTOR based on the following:

   (1)  For haulage of loads tendered by CARRIER:

| | |
|---|---|
| Power Unit/Tractor | 67% of 98% of Adjusted Gross Revenue ("AGR") |
| Power Unit with CARRIER's Platform Trailer on Fixed Rental | 75% of 98% (AGR) |
| Power Unit while pulling CARRIER's Refrigerated Trailers | 68% of 98% (AGR) |
| Regular Trailer (van, flat, extendible flat, stepdeck) | 8% of 98% (AGR) |
| Specialized Trailer (double drop, tri-axle, insulated van w/heater) | 9% of 98% (AGR) |
| Refrigerated Trailer | 10% of 98% (AGR) |
| Heavy Haul Trailer (7 or more axles in combination) | 10% of 98% (AGR) |

   (2)  Adjusted Gross Revenue shall mean revenue to CARRIER shown on freight bills, or amended bills, to the shippers, consignees, or other carriers for commodities hauled by INDEPENDENT CONTRACTOR, reduced by: (a) any and all expenses attributed to accessorial services paid to a third party or to INDEPENDENT CONTRACTOR by CARRIER; (b) the amount paid to any third party by CARRIER in relation to movement of the load, including without limitation: amounts paid to other contractors as a pro rata payment for their participation in the movement of a load; any amount paid by CARRIER to interline or augmenting carriers; and, any warehouse or storage charges; (c) any revenue received by CARRIER as an excess value charge on high value freight charge; (d) all incentives, discounts or commissions given to CARRIER's customers or other third parties; and (e) amounts paid or accrued for certain specialized trailers and excessive trailer spotting situations.

(b)  **Accessorial Services Charges**: The percentages of Accessorial Charges listed below shall be paid to INDEPENDENT CONTRACTOR, provided that such Accessorial Services Charges are covered by a written contract or tariff and are billed to and collected from a shipper or customer by CARRIER:

| | |
|---|---|
| Detention | - 100% |
| Tarping | - 100% |
| Loading | - 100% |

CONTRACT 01/16/98

```
Unloading                            -  100%
Sort & Segregate                     -  100%
New York City                        -  100%
Motor Surveillance (A & E)           -  100%
Satellite Tracking                   -   85%
Government Security (A & E)          -   85%
Constant Surveillance (A & E)       -   85%
Protective Services (A & E)          -   85%
```

All other accessorial charges, including but not limited to team operation, job site delivery, air ride, dual driver, temperature control and stop-off pay shall be paid to INDEPENDENT CONTRACTOR based on its percentage of Adjusted Gross Revenue specified above, provided that such other accessorial charges are covered by a written contract or tariff and are billed to and collected from a shipper or customer by CARRIER.

(c)  <u>Chargeback Expenses</u>: Pursuant to Paragraphs 10 and 11 of this Agreement, the amounts to be charged back to INDEPENDENT CONTRACTOR by CARRIER for license plates and permits provided by CARRIER shall be based on the following annual fees:

```
IRP Base Plate      -        $1,500 per tractor
Permits -                    $  325 per tractor
```

(d)  <u>Electronic Weekly Settlements (Landstar Card)</u>: CARRIER shall provide INDEPENDENT CONTRACTOR with a debit card (Landstar Card). Unless INDEPENDENT CONTRACTOR requests otherwise, settlement of the INDEPENDENT CONTRACTOR's processed trips shall be deposited electronically each week by CARRIER on the Landstar Card and will be subject to an administrative fee of one dollar and seventy-five cents ($1.75) per deposit.

All chargeback items and fees to be deducted from INDEPENDENT CONTRACTOR's Share of Revenue herein are subject to adjustment, by CARRIER. No less than thirty (30) days prior to any adjustment INDEPENDENT CONTRACTOR will be notified in writing by CARRIER of the adjustment, the amount of adjustment and the date the adjustment is proposed to take effect. If INDEPENDENT CONTRACTOR does not agree to the change, it shall notify CARRIER on or before the proposed effective date of adjustment. Acceptance of any load by INDEPENDENT CONTRACTOR after the proposed effective date of the adjustment will indicate understanding and acceptance by INDEPENDENT CONTRACTOR of the new fee or chargeback amount and the parties will use their best efforts to promptly execute a written addendum reflecting the adjusted fee or rate.

CONTRACT 01/16/98

## APPENDIX B

### Insurance

It shall be CARRIER's responsibility, pursuant to federal, provincial and/or state law, to provide no less than the minimum legislated public liability and property damage insurance for the Equipment at all times while the Equipment is being operated on behalf of CARRIER.  The parties agree and understand that CARRIER's qualification as a self-insurer with the Federal Highway Administration satisfies its insurance obligations under federal law.  CARRIER's possession of the required insurance shall in no way affect CARRIER's right of indemnification against INDEPENDENT CONTRACTOR as provided for in this Agreement.

INDEPENDENT CONTRACTOR shall maintain, at its sole cost and expense, the following minimum insurance coverages during the term of this Agreement:

1.  Unladen Liability ("Bobtail").  INDEPENDENT CONTRACTOR shall procure, carry and maintain public liability and property damage insurance which shall provide primary coverage to INDEPENDENT CONTRACTOR whenever the Equipment is not transporting freight on behalf of CARRIER, which coverage shall be in a combined single limit of not less than One Million Dollars ($1,000,000.00) for any one occurrence (the "Non-Trucking Use - Broad Form Unladen Policy).  The Non-Trucking Use - Broad Form Unladen Policy shall name CARRIER and its affiliates as additional insureds, and shall provide (1) for first dollar coverage with no deductibles, (2) for waiver of the insurer's subrogation rights against each additional insured, (3) shall apply whenever the Equipment is either "bobtailing" or "deadheading", and (4) shall be primary with respect to all insureds.  For purposes of such insurance, "bobtailing" means the Equipment is being operated without a trailer attached and "deadheading" means the Equipment is being operated with an attached trailer which does not contain or carry any cargo  INDEPENDENT CONTRACTOR expressly acknowledges that it shall be solely responsible for any loss in excess of policy limits and shall indemnify and hold CARRIER harmless against any loss in excess of INDEPENDENT CONTRACTOR'S policy limits.  Such policy of insurance coverage shall provide for thirty (30) days prior notice to CARRIER of cancellation or material change  In the event that INDEPENDENT CONTRACTOR fails to provide CARRIER with proof of insurance coverage required under this provision, INDEPENDENT CONTRACTOR authorizes CARRIER to deduct from INDEPENDENT CONTRACTOR's compensation an amount of Sixteen Dollars and Ninety-Nine Cents ($16.99) per unit per week for the Non-Trucking Use - Broad Form Unladen Policy required by this provision.  INDEPENDENT CONTRACTOR may, in accordance with policy terms, cancel the certificate of insurance for Non-Trucking Use - Broad Form Unladen Policy provided by CARRIER at any time as INDEPENDENT CONTRACTOR elects by written notice to CARRIER or the appropriate insurance agent, provided, however, that such cancellation does not affect INDEPENDENT CONTRACTOR's obligations and undertakings under this Agreement.  INDEPENDENT CONTRACTOR understands that Non-Trucking Use - Broad Form Unladen Policy provided by CARRIER does not apply to injury or damage to INDEPENDENT CONTRACTOR, or its workers, nor to collision or comprehensive coverage to the Equipment, and it is further understood that if INDEPENDENT CONTRACTOR desires to have such coverage, it shall have the duty to obtain and pay for it.

2.  Tractor Damage.  It is INDEPENDENT CONTRACTOR's responsibility to procure, carry and maintain any fire, theft or collision insurance that INDEPENDENT CONTRACTOR may desire for the Equipment.  CARRIER shall not be liable for any loss of or any damage to the Equipment, and INDEPENDENT CONTRACTOR expressly waives all claims it may have in the future against CARRIER for such loss or damage to the Equipment.  INDEPENDENT CONTRACTOR may, at its sole discretion, elect to purchase collision insurance through CARRIER, in which case CARRIER will (1) furnish INDEPENDENT CONTRACTOR a copy of the policy upon request, and (2) provide a certificate of insurance to INDEPENDENT CONTRACTOR, which shall show the name of the insurer, the policy number, the effective dates of coverage, the amounts and types of coverage, the deductible or retained liability amounts for which INDEPENDENT CONTRACTOR may be liable, and the cost to INDEPENDENT CONTRACTOR for such requested coverage.

3   Worker's Compensation or Occupational Accident Coverage   Prior to commencing operations under this Agreement, INDEPENDENT CONTRACTOR shall provide a certificate of insurance, acceptable to CARRIER, showing that INDEPENDENT CONTRACTOR has procured worker's compensation insurance in an amount not less than the statutory limits required in INDEPENDENT CONTRACTOR's state of residence, including employer's liability insurance in an amount not less than Five Hundred Thousand Dollars ($500,000.00).  INDEPENDENT CONTRACTOR shall provide CARRIER with a certificate of insurance, acceptable to CARRIER, showing that written notice of cancellation or modification of the policy shall be given to CARRIER at least thirty (30) days prior to such cancellation or modification.  Notwithstanding anything to the contrary in this Agreement, if INDEPENDENT CONTRACTOR has no drivers other than himself or INDEPENDENT CONTRACTOR only uses drivers who own their equipment, then, in lieu of the required worker s compensation coverage, INDEPENDENT CONTRACTOR can participate in the "Contractor Protection Plan" approved by CARRIER and offered through CARRIER s insurer, or any occupational accident plan acceptable to CARRIER that

11                                                                    CONTRACT 01/10/96

provides, at a minimum, the following:

(a)    Coverage for substantially all claims which are considered compensable under applicable state or provincial workers' compensation laws even though the claimant under the coverage may be an independent contractor and may not typically be entitled to worker's compensation benefits;

(b)    Coverage of $500,000.00 aggregate per occupational accident;

(c)    A minimum of $400.00 per week occupational accident disability benefits with a maximum seven day waiting period;

(d)    A minimum of $50,000.00 lump sum accidental death benefits;

(e)    A minimum 24 month temporary total disability benefit;

(f)    First dollar occupational medical coverage with no deductible and a minimum of 104 weeks of medical coverage;

(g)    Indemnification of CARRIER from all policy benefits the claimant may have received from an occupational accident covered under such coverage but did not receive because claimant pursued worker's compensation benefits instead of benefits available under the occupational accident coverage; and

(h)    Certification showing that written notice of cancellation or modification of the plan shall be given to CARRIER at least thirty (30) days prior to such cancellation or modification.

If INDEPENDENT CONTRACTOR fails to acquire and maintain the worker's compensation insurance or acceptable alternatives required herein, then CARRIER shall have the right, but not the obligation, to include INDEPENDENT CONTRACTOR's participation in the Contractor Protection Plan and shall be entitled to deduct and charge back INDEPENDENT CONTRACTOR the amount of $26.00 per unit per week for CARRIER's expense in obtaining such coverage on INDEPENDENT CONTRACTOR's behalf. CARRIER's Contractor Protection Plan is NOT statutory worker's compensation and employer's liability coverage, and even when INDEPENDENT CONTRACTOR is provided coverage under the terms of CARRIER's Contractor Protection Plan, INDEPENDENT CONTRACTOR shall still be responsible for any worker's compensation and employer's liability insurance coverage that may be required by applicable law.

In the event that INDEPENDENT CONTRACTOR obtains insurance coverage through CARRIER pursuant to this provision, CARRIER or the insurance underwriter shall provide INDEPENDENT CONTRACTOR with a certificate of insurance for each insurance policy under which the INDEPENDENT CONTRACTOR is provided coverage. Such certificate shall state the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, the cost to INDEPENDENT CONTRACTOR for each type of coverage, and the deductible or retained liability amounts for which INDEPENDENT CONTRACTOR may be liable. A copy of the actual policy is available for review by INDEPENDENT CONTRACTOR at CARRIER's principal place of business. INDEPENDENT CONTRACTOR recognizes and agrees that CARRIER is not in the business of selling or soliciting insurance, and any insurance coverage requested by INDEPENDENT CONTRACTOR or provided through CARRIER is subject to all of the terms, conditions and exclusions of the actual policy issued by the insurance underwriter. In the event that the insurance costs shall change or vary, as determined by the insurer, CARRIER shall advise INDEPENDENT CONTRACTOR of such change in insurance cost in writing and INDEPENDENT CONTRACTOR's failure to object or terminate the coverage being provided through CARRIER in writing to CARRIER shall constitute an express consent and authorization to CARRIER to deduct and charge back to INDEPENDENT CONTRACTOR the revised amount.

CONTRACT 01/16/98

## APPENDIX C

### Equipment Purchase Program

1.    Tractor Computer Purchase - As evidenced by execution of this Agreement, INDEPENDENT CONTRACTOR has elected to finance through CARRIER or an affiliated company the purchase or lease of certain tractor computer equipment.    The parties acknowledge that the terms of that financing agreement are set forth in a separate note and security agreement ("Contract").    Pursuant to the terms of the Contract, INDEPENDENT CONTRACTOR hereby authorizes CARRIER to deduct from any settlements or any other sums owed by CARRIER to INDEPENDENT CONTRACTOR the costs associated with that financing, including, application fees, down payments, the principal amount, interest, and any other fees, expenses or charges for which INDEPENDENT CONTRACTOR is obligated pursuant to the terms of the Contract.

CONTRACT 01/16/98

## APPENDIX D

### Trailer Utilization Program

(a) <u>Trailer Utilization Fee</u>:  CARRIER will deduct from INDEPENDENT CONTRACTOR's settlement the following amount for each week a trailer provided by CARRIER is used by or in the possession of INDEPENDENT CONTRACTOR or its workers:

| Type of Trailer | Weekly User Fee |
|---|---|
| Flatbed | $155.00/per week |
| Step Deck | $170.00/per week |
| Extendible | $185/per week |
| Double Drop | $260/per week |

(b) <u>Trailer Maintenance</u>:  CARRIER shall be responsible for all maintenance, including tires and repairs, needed to insure safe and efficient operation of any trailer provided for use by CARRIER. As a condition of using CARRIER's trailer, INDEPENDENT CONTRACTOR agrees to follow CARRIER's Trailer Policies and Procedures, including Preventative Maintenance Schedules, copies of which are available from CARRIER upon request.

(c) <u>Use of Trailer</u>:  It is further agreed by the parties that in the event INDEPENDENT CONTRACTOR or its workers shall change or substitute any parts or accessories of CARRIER's trailer including, but not limited to, the tires of said equipment, without written permission from CARRIER, then INDEPENDENT CONTRACTOR shall pay CARRIER a sum not to exceed the actual cash value, as calculated by CARRIER, for each such unauthorized change or substitution.  INDEPENDENT CONTRACTOR agrees to return CARRIER's trailer in the same good condition as received by INDEPENDENT CONTRACTOR, reasonable wear and tear excepted, along with any and all other equipment or property belonging to CARRIER immediately upon CARRIER's request or upon termination of this Agreement at a time and place designated through CARRIER.  In the event the trailer is not in as good a condition as it was when delivered by CARRIER, INDEPENDENT CONTRACTOR hereby authorizes CARRIER to restore the trailer to proper condition and to deduct or charge INDEPENDENT CONTRACTOR for such repairs or reconditioning.  In the event INDEPENDENT CONTRACTOR for any reason fails to comply with this provision, INDEPENDENT CONTRACTOR agrees to reimburse CARRIER for all reasonable expense and cost incurred by CARRIER in recovery of its trailer and/or property from INDEPENDENT CONTRACTOR or its workers.  INDEPENDENT CONTRACTOR agrees that in the event it is necessary for CARRIER to enter upon private property and/or remove private property in order to recover its trailer and/or property, INDEPENDENT CONTRACTOR does hereby irrevocably grant CARRIER or its duly authorized agents, permission to do so and further agrees to save and hold harmless CARRIER, or its duly authorized agents, from any form of liability for any claim or damage whatsoever in connection with such repossession.

CONTRACT 01/10/98

## APPENDIX E

## Fuel and Mileage Taxes

CARRIER shall prepare and file all reports required under the International Fuel Tax Agreement ("IFTA") or other applicable state or provincial law with respect to the fuel and mileage taxes incurred by the Equipment during the term of this Agreement, pursuant to the following procedures:

1.    INDEPENDENT CONTRACTOR shall be responsible for the payment of all fuel and mileage taxes payable for the Equipment during the term of this Agreement.

2.    INDEPENDENT CONTRACTOR agrees to timely submit all documents, including but not limited to original and legible fuel receipts, temporary permits showing fuel and/or mileage taxes paid, and toll tickets, required by CARRIER in order to prepare the necessary tax filings.    INDEPENDENT CONTRACTOR shall be responsible for any additional tax, expense, penalty or interest incurred as a result of INDEPENDENT CONTRACTOR's failure to submit such required documents.

3.    CARRIER shall calculate on a monthly basis the fuel owed for the Equipment in each applicable state and province.   Any such tax that is owed after calculating the credit given to INDEPENDENT CONTRACTOR for purchases made at the pump shall be charged back to INDEPENDENT CONTRACTOR on a monthly basis as a pre-trip settlement. Additional information regarding the procedures utilized by CARRIER in calculating fuel taxes is available from CARRIER upon request.   Tax credits available due to the over-purchase of fuel by INDEPENDENT CONTRACTOR shall, as allowed by state and provincial law, be carried over and applied by CARRIER to the next month's tax liability.   Upon termination of the Agreement, CARRIER shall pay INDEPENDENT CONTRACTOR, as part of its final settlement, any fuel tax refund that INDEPENDENT CONTRACTOR may be entitled to, provided, however, that any such refund will first be applied to any expense owed to CARRIER by INDEPENDENT CONTRACTOR under this Agreement.

4.    Mileage taxes are computed on a per load basis for miles traveled in those states that assess a mileage tax.   CARRIER shall charge back all owed mileage taxes to INDEPENDENT CONTRACTOR on a per load basis as a pre-trip settlement.

5.    INDEPENDENT CONTRACTOR agrees to cooperate fully with CARRIER, and to provide CARRIER with any additional documentation requested by CARRIER, in connection with any fuel or mileage tax audit.   In the event that additional taxes are assessed to the Equipment after any such audit, then INDEPENDENT CONTRACTOR agrees to pay such additional taxes; provided, however, that INDEPENDENT CONTRACTOR shall not be responsible for the payment of any penalties or interest due to any error made by CARRIER in preparing the various tax reports.